BURTON ET AL. *v.* PEPPER ET AL.

[76 South. 762, Division B.]

1. CHATTLE MORTGAGE. *Security to landlord. Receivers.*

Where a landlord takes a trust deed from his tenant to cover advances with which to make a crop, but immediately refuses to make the advances, such trust deed cannot be used as a basis for the appointment of a receiver, although it recites that it is to be also supplemental security for a balance due under a deed of trust for the preceding year, where the tenant acquiesces in the refusal of the landlord to furnish the advances and offers possession of the premises; since such acts are in effect a cancellation by agreement.

2. CHATTEL MORTGAGE. *Insolvency. Grounds for appointment of receiver.*

A landlord cannot take a deed of trust from his tenant to secure advances, and then refuse to make the advances and have a receiver appointed, although the tenant be of limited means and practically insolvent, unless he had the fraudulent intent of misappropriating the funds or was abandoning the property.

3. GROUNDS FOR RECEIVER. *Landlord and tenant. Chattel mortgages.*

A trust deed on stock, machinery, and crops given by a tenant to his landlord for a past year, is not basis for the appointment of

a receiver to farm the rented premises and use the debtor's property for the current year. The only thing the landlord can do is to sell the property covered by the trust deed either in equity or by the trustee, and the tenant is entitled, where the tenancy is treated as terminated, to an early sale.

4. CHATTEL MORTGAGES. *Action for possession. Receivers. Summary action.*

A landlord cannot gain possession of the rented premises, from the tenant by the summary appointment of a receiver without notice.

5. CHATTEL MORTGAGES. *Unlawful use of property by landlord. Right to rent.*

Where a landlord having taken a deed of trust on the machinery and stock of his tenant for supplies to be furnished, had a receiver appointed before planting the crop, and without any order therefor spent money and used the tenant's stock and machinery, taking full control of the property though doing so in the name of the receiver, pending a delayed foreclosure of the trust deed. In such case the lease will be held to have been terminated and the tenant was not chargeable with rent after the receiver was appointed.

6. LANDLORD AND TENANT. *Receivers. Grounds for appointment. Deed of trust. Foreclosures.*

To justify a receiver in a foreclosure suit there should be a clear showing of inadequacy of the security, the insolvency of the mortgagor, and a present need for the preservation and management of the mortgaged property; also that the tenant had either, removed or abandoned the premises or was misappropriating the property and placing it beyond the jurisdiction of the court, or doing some other act tending to destroy the value of the security.

7. RECEIVER. *Appointment. Notice. Necessary. Good cause. Code 1906. Section 625.*

Under Code 1906, section 625, providing that "good cause" must be shown why notice should not be given only the greatest emergency will entitle one to the appointment of a receiver without notice. Mere insolvency does not justify the appointment of a receiver to take charge of the assets of an individual debtor.

8. RECEIVER. *Application for appointment. After litigation conditions.*

Conditions in property after the institution of proceeding for the appointment of a receiver in a foreclosure suit, cannot change the legal rights of the parties as they existed at the time of the institution of the suit.

9. RECEIVERS. *Motion for removal. Intervening parties' rights.*

> The joining in of creditors, after the appointment of a receiver, seeking merely their *pro rata* share in any excess after the secured creditors are paid, has no direct bearing on the rights of the original parties, in a proceeding to remove the receiver for error in his appointment.

APPEAL from the chancery court of Holmes county.
HON. A. Y. WOODWARD, Chancellor.

Bill for appointment of receiver by D. G. Pepper and other against R. L. Burton and others. From a decree overruling a motion to revoke a decree appointing a receiver, defendants appeal.

In the year 1914 appellant Burton was the tenant of, and appellee D. G. Pepper was the owner of, the two plantations in Holmes county known as Winter Quarters and Famosa. The term of the written lease was a period of five years, beginning in 1914, and the annual rent agreed upon was three thousand dollars, due November 1st of each year. Prior to the execution of this lease Mr. Burton had completed a five-year lease, and during this time the landlord appears to have furnished Burton with money with which to make his crops. In the beginning of the year the parties would agree upon an amount to be furnished and thereupon Mr. Burton, the tenant, would execute his note for the sum agreed upon and secure the same by a deed of trust upon the live stock, agricultural implements, and the crop to be raised that year. In the year 1914 the parties agreed upon an advance of eight thousand dollars. In addition to the security mentioned, there was embraced in the deed of trust about one hundred acres of wild lands in Issaquenna county. Appellee, Capt. D. G. Pepper, resided at Sardis, Miss., and his son, Hon. A. M. Pepper, at Lexington, Miss., assisted his father in looking after the plantations and in concluding arrangements with the tenant. In furnishing money to the tenant Mr. Burton would execute his note and trust deed, and the promissory note and security would then be taken by Mr. Pepper and assigned to the Bank of Lex-

ington which placed the proceeds to Mr. Burton's "plantation account." This account would be drawn upon at intervals as agreed on by Burton and Mr. A. M. Pepper. It appears that Mr. Burton made rather a short crop in 1914, and that cotton at the close of this year was selling at a very low price, said to be due to the European war and a generally depressed cotton market. Instead of selling the cotton raised in 1914, the tenant, by agreement of the parties, delivered to Captain Pepper and the Bank of Lexington the receipt for seventy-nine bales of cotton in the compress at Greenwood, and one hundred and fifteen bales with Montgomery Bros., at Yazoo City, to be held by the landlord for better prices. In February, 1915, the landlord agreed to advance Burton six thousand dollars, with which to make and gather the crop in 1915. To this end Mr. Burton executed the usual note and deed of trust, and by agreement the deed of trust not only secured the advances to be made in 1915, but expressly recited that it was to secure any balance then due by Burton to his landlord upon the unpaid indebtedness of 1914. The note and deed of trust for 1915 were executed, and by the landlord indorsed to the Bank of Lexington and filed for record. After the trust deed had been filed for record, appellee claims that Mr. Pepper then for the first time examined the records in the clerk's office and to his surprise discovered that Mr. Burton had executed two deeds of trust to the Bank of Belzoni in Washington county, covering some of the live stock embraced in the deed of trust given Mr. Pepper. There was then some negotiation between the parties seeking to have the liens in favor of the Bank of Belzoni satisfied or canceled, or if this could not be done to have the Bank of Belzoni make the advances for 1915. Mr. Burton did not succeed in having these liens canceled, and thereupon by agreement with A. M. Pepper, Mr. Burton went to Yazoo City to induce the Yazoo Grocery Company, one of his creditors, to make the advances for 1915. Mr. Burton took with him upon this misson a letter

of recommendation from A. M. Pepper. Mr. Burton did
not succeed in getting the Yazoo Grocery Company to ad-
vance supplies for the year 1915, and Captain Pepper
thereupon declined to make the advances or to have the
Bank of Lexington do so. In this state of affairs Capt.
D. G. Pepper, acting through his son, on March 9, 1915,
filed his bill of complaint in this cause against Mr. Bur-
ton, asking that a receiver be appointed to take charge of
the plantations and all personal property of R. L. Burton
embraced in two deeds of trust above mentioned, asking
a foreclosure of the deeds of trust, and that the receiver
be authorized and directed to work the plantations for
1915, or to deliver to the complainant possession in order
that the complainant might work or re-lease the same.
The bill of complaint with exhibits thereto was then
presented to the chancellor in vacation, without any
notice to the defendant Burton, and the chancellor, on
March 10, 1915, appointed C. H. Campbell as receiver.
The receiver took possession of the plantations, and, act-
ing under decrees from the court, planted crops for the
year 1915, and was cultivating the lands and operating
the plantations, when at the May term, 1915, Burton filed
a motion to revoke the appointment of a receiver, and
asking that if the court could not revoke and set aside
generally the decree appointing the receiver, then to
alter the decree which authorized and directed the re-
ceiver to take charge of the live stock and personal prop-
erty embraced in the deeds of trust, and allow the de-
fendants to bond same. Before the May term of court,
the defendant Burton filed a general answer denying the
material equities of the bill. In April the complainant
amended the original bill in which it is averred that some
of the mules had been unlawfully taken by Burton, the
Bank of Belzoni, and other parties, from the possession
of the receiver by means of a fictitious replevin suit,
and the amendment prayed for the issuance of an in-
junction to restrain the prosecution of the said replevin
suit. In May also certain unsecured creditors joined

in the bill. The prayer of the intervening creditors is that they be made parties complainant in this cause; that notice be given to all other creditors of R. L. Burton to come forward and file their claims with the receiver, and that all unsecured creditors be allowed their pro rata share of any and all assets remaining after the secured creditors have been satisfied. These unsecured creditors are represented by the same counsel who filed the original bill. On May 24, 1915, notice was served by the defendants that their application to the court, asking that the appointment of a receiver be revoked and that the receiver be removed, would be heard at the courthouse in Lexington at the time therein stated. Formal motion was filed by R. L. Burton, challenging the right of the complainant to have a receiver appointed, and asking that the appointment be altogether revoked. There was also an alternative prayer by the defendant that, in event the motion to revoke the appointment should be overruled, the order of appointment should at least be modified so as to permit the defendant Burton to execute a forthcoming bond for the live stock and other personal property conditioned according to law, and to abide the final decree of the court. J. W. McClintock, Bank of Belzoni, Grenada Bank, and the trustees in the trust conveyances executed by Burton to the Bank of Belzoni and Grenada Bank, the defendants interested in certain of the mules and horses pledged to said banks, joined the defendant Burton in asking for the removal of the receiver, and also joined in the request that the defendant Burton be allowed to give bond for the personal property involved in this suit. These motions were duly presented to the chancellor, and the court, upon consideration of the pleadings, motions, and certain oral testimony, overruled the motions of the defendants. From this interlocutory decree overruling the motions of the defendants, an appeal by permission of the chancellor is prosecuted to this court. The complainants offered as witnesses C. H. Campbell, the receiver, Vess Simms, a negro tenant, J. A. Long, M. L.

Smith, and A. M. Pepper, to show the general condition of the plantations and the live stock at the time the receiver took charge, and what was being done with the plantations pending litigation. Capt. D. G. Pepper also testified in his own behalf. The following letters were also introduced as exhibits to the testimony of the witness A. M. Pepper:

"Lexington, Miss., February 15, 1915. Mr. R. L. Burton, Belzoni, Miss.—Dear Mr. Burton: Confirming my telephone conversation with you yesterday I beg to say that I received a letter from father Saturday evening in reply to a letter from me in reference to advancing you money to make and gather the crop for 1915 on his Winter Quarters and Famosa plantations. He advises me that he has decided he can do nothing further in that direction, in view of the fact that you have leased another place and given other deeds of trust on part of your stock to other parties, all of which we have discovered since you were here a few days ago. He is also of the opinion that under the circumstances there would be considerable doubt of your ability to pay the proposed advances for 1915 and rent for 1915 and the balance due for rent and supplies in 1914 out of the crops of 1915, with cotton at prices now prevailing and which will doubtless prevail this fall. I therefore suggest that you take this matter up with the Bank of Belzoni and see if they desire to pay the balances you owe my father for rent and supplies for 1914, and to take over his securities given by you, which I trust they will decide to do for you, and make you whatever advances you may need. I am mailing you this letter by special delivery in care of the Bank of Belzoni, as you will doubtless desire to give same your immediate attention. Yours very truly, A. M. Pepper."

"Belzoni, Miss., February 15, 1915. Hon. A. M. Pepper, Lexington, Miss.—Dear Sir: I was surprised at your conversation Sunday over the telephone. If you will think just a little, your father does only furnish me

with one-third of the amount that it takes to run the place during the year. Your father has not furnished a single dollar that was paid this stock you was talking to me about and if I was depending on you all for the whole year I could not keep up the place. If you will think a moment the way you all furnish me you tie me up hard and fast and when my money gives out you will not furnish one cent more. I have to do the best I can the balance of the year and if I did not have no other resources what could I do? Don't it look hard that you want security on every single thing I have and only furnish less than half of the year. Now, my dear Mr. Pepper, if this is the way you are going to treat me I think it is time for us to close up our business after six years of hard work and the only time I have failed to pay my debts, it looks to me as it is little use to try to do the right thing. Now, Mr. Pepper, if you will not carry out this agreement we had the other day I will have to quit business. You agreed to have two thousand dollars in the bank for me to draw and I have drawn on the bank for this amount. As for me waiting until the 15th of March and as I understand you to say you could not let me have only one thousand dollars and that not until the 15th of March, this is clear out of the question. Now if you will not do as our agreement was we will have to get up the cotton and mules and close up our business. If you will give me a few days I can get what I owe your father, I have plenty of stuff at a reasonable price to more than pay you all I owe you all. If I get a few good days I can get through picking cotton and will be ready to settle up in full and turn over the place to you and look out for myself. Let me hear from you by return mail. Yours truly, R. L. Burton."

"Lexington, Miss., February 16, 1915. Mr. R. L. Burton, Belzoni, Miss.—Dear Mr. Burton: Your letter of 15th inst. just received. I have fully advised my father of same, and he still insists under the circumstances he would prefer for his property to lie out than to become responsible at his age for anything further under pres-

ent conditions, especially since he will be forced to borrow money this year to pay his own living expenses as he has no other income except from the rents of the property. Personally I was very anxious to have the property worked this year if the same could be done without any risk to him, but he is of the opinion that it cannot be done, consequently I am very glad indeed to note from your letter that you are in position to make a full settlement as soon as you finish picking cotton now in the field, and deliver the property to a representative who my father will appoint for that purpose. Yours very truly, A. M. Pepper.''

*Elmore & Ruff,* for appellant.

The following general statement with a reference to the power of a court of equity to appoint a receiver is taken from the latest edition of High on Receivers on pages 5 and 6: ''The power is justly regarded as one of a very high nature and not to be exercised when it would be productive of serious injustice or injury to private rights. The exercise of the extraordinary power of a chancellor in appointing receivers as in granting writs of injunction or *ne exeat,* is an exceedingly delicate and responsible duty, to be discharged by the court with the utmost caution, and only under such special or peculiar circumstances as demand summary relief. Indeed, the appointment of a receiver is regarded as one of the most difficult and embarassing duties which a court of equity is called upon to perform. It is a peremptory measure,whose effect, temporarily at least, is to deprive of his property a defendant in possession, before a final judgment or decree is reached by the court determining the rights of the parties. It is therefore not to be exercised doubtfully, but the court must be convinced that the relief is needful, and that it is the appropriate means of securing an appropriate end, and since it is a serious interference with the rights of the citizens without the verdict of a jury and before a regular hear-

ing, it should be granted only for the prevention of
manifest wrong and injury. And because it divests the
owner of property of its possession before a final hear-
ing, it is regarded as a severe remedy, not to be adopted
save in a clear case, and never unless plaintiff would
otherwise be in danger of suffering irreparable loss.

And since a receivership is a harsh and costly remedy,
interfering seriously with the rights of persons in pos-
session, courts of equity exercise extreme caution in the
appointment of receivers and withhold the remedy un-
til a proper case has been made therefore."

However there may be a departure from this rule in
cases of great emergency. What will warrant a depart-
ure is set forth in paragraph 113 of the same authority.

Our statute enforces the same rule. It requires notice
to be given save in exceptional cases where "it shall
appear that an immediate appointment is necessary or
good cause be shown for not giving notice." Code, sec-
tion 625.

It should be kept in mind also that the remedy by a
receiver "is a provisional or auxilliary one, invoked
as an adjunct or aid of the principal relief sought by the
action and never as the ultimate object of the action.
The court must have jurisdiction independent of the re-
ceivership and a receivership is never appointed ex-
cept as a measure in aid of the enforcement of some rec-
ognized equitable right." High on Receivers, par. 6.

*Boothe & Pepper* and *E. F. Noel,* for appellees.

The following general statement with reference to the
power of the court of equity to appoint a receiver is
taken not only from the text books but also from the
statutes of our own state and the decisions of our own
supreme court in construing the general and statutory law
controlling the appointment and the duty of receivers.

"Receiver defined. A receiver is an indifferent per-
son between the parties, appointed by the court, and on
behalf of all parties, and not of the complainant or de-
fendant only, to receive and hold the thing or property
in litigation, pending the suit, to receive the rents, issues,

or profits of land or other things in question; to receive
rent or other income, and to pay ascertained outgoings,
when it does not seem reasonable to the court that either
party should hold it; to hold possession and control of
property which is the subject matter of litigation, and
to dispose of the same or deliver it to such person or
persons as may be directed by the court. He is said to be
the arm and the hand of the court; a part of the machine
of the court, by which the rights of parties are protected.
When a receiver is required not only to preserve the
property but also for the purpose of carrying on or
superintending a trade or business he is sometimes called
a receiver, or receiver and manager. A statutory re-
ceiver is one appointed in pursuance of special statu-
tory provisions, under which the office is sometimes ex-
pressly defined." 34 Cyc, 15, 17, 18; *Mays* v. *Rose,* Free-
man Chancery (Miss.), 703; 34 Cyc, 128, 129, 278, 352.

The receiver in this cause was applied for by appel-
lees and appointed by the chancellor in vacation in ac-
cordance with section 625, of the Code of 1906, which
is as follows: "Receivers; not appointed without no-
tice unless, etc., A receiver shall not be appointed with-
out the party praying the appointment have given the
opposite party at least five days' notice of the time and
place of making the application, and one additional day
for every thirty miles of travel thereto unless it shall
appear that an immediate appointment is necessary or
good cause be shown for not giving notice."

"In order to obtain the appointment of a receiver the
plaintiff must show first either that he has a clear right
to the property itself, or that he has some lien upon it or
that the property constitutes a special fund to which he
has a right to resort for the satisfaction of his claim.
Secondly, that the possession of the property by the de-
fendant was obtained by fraud, or that the property it-
self, or the income arising from it is in danger of loss
from the neglect, waste, misconduct, or insolvency of the
defendant." *Mayes* v. *Rose* (Miss.), Freeman Chancery

Report, 703; *Phillips* v. *Elland,* 52 Miss. 721; *McDonald* v. *Vinson,* 56 Miss. 497; *Pearson* v. *Kendrick,* 74 Miss.—.

In the above case the receiver was appointed without notice for the purpose of taking charge of land, mules, wagons, crop, rents, etc. The discretion of the chancery court to appoint a receiver without notice or otherwise is and must be governed by the facts in each individual case, as has been previously shown under the authorities cited.

Our court, in two of the most recent decisions bearing upon the appointment of receivers has enlarged the doctrine and scope of receiverships and the duty of the court in connection therewith in case of *Benjamin* v. *Staples, Receiver,* 93 Miss. 507.

Your appellees therefore most confidently submit and pray this court that the order of the chancery court confirming the appointment of the receiver and overruling motions to discharge the receiver and to deliver the property in controversy to appellant, and the previous orders of the chancellor appointing the receiver, designating his duties, in the management of the real and personal property covered by the receivership, be affirmed.

STEVENS, J., delivered the opinion of the court.

(After stating the facts as above). The bill of complaint exhibits, and complainant's case is based upon, both deeds of trust, the one executed for the year 1914 and the renewal trust deed executed February 12, 1915. The prayer of the bill is that "all the personal property belonging to the said R. L. Burton and included in said deeds of trust, filed herewith" be advertised and sold; that a receiver be appointed to take charge of the same for that purpose; that the receiver be authorized to work or lease the plantations for the year 1915, "or to deliver said plantations to the said D. G. Pepper, complainant, landlord and owner thereof, to be worked or re-leased by him during the year 1915, as provided by the terms of said lease, default having been made by the said R. L.

Burton, lessee." There is also a prayer that the receiver be appointed without notice, in accordance with section 626 of the present Code. The right of the complainant to the appointment of this receiver depends largely upon the circumstances of the parties and their relationship one to the other. The record shows that Mr. Burton had been leasing these plantations from D. G. Pepper, his landlord, for five years, and each year during this time the landlord had agreed to make advances to his tenant, and as security therefore would take a note and trust deed at the beginning of each year.

At the time the bill was filed, the cotton of 1914 had not been sold, but by agreement between landlord and tenant was being held for a better market. The compress receipts for the cotton were in the possession of the landlord at the time he agreed to advance the six thousand dollars for the year 1915. The carrying of these receipts necessarily deferred a final settlement between the parties, and necessarily deferred a foreclosure of the deed of trust given in 1914. The proof does not show the exact agreement between the parties as to the holding of this cotton for better prices. The case as now made is presented solely upon the pleadings and the proof offered on behalf of the complainants, and the sole inquiry is whether the chancellor erred in declining to revoke the appointment and remove the receiver. Any test of the interlocutory decree appealed from really presents the question whether a receiver should have been appointed in the first instance. Inasmuch as no opportunity was given the defendant to be heard when the receiver was first appointed, the motions which the chancellor overruled is the first hearing accorded him. While it is difficult to determine the exact agreement whereby the cotton was stored in compresses and held for better prices, it does appear from the testimony of Mr. A. M. Pepper that Burton, the tenant, was privileged to secure bids on the cotton and submit them, and thereby to cooperate with the landlord in effecting a satisfactory sale.

It appears that no bid satisfactory to the landlord had been made on the cotton at the time the trust deed for 1915 was executed, or even at the time the bill was filed. The negotiations of the tenant for supplies for the year 1915 was, as usual, had with Mr. A. M. Pepper, son of the landlord, and the parties agreed upon six thousand dollars in addition to the rent of three thousand dollars. In attempting to conclude arrangements for 1915, the tenant executed a deed of trust to secure an indebtedness of nine thousand and four hundred dollars, evidenced by one promissory note for six thousand and four hundred dollars due and payable December 15, 1915, and the rent note for three thousand dollars payable November 1, 1915. This deed of trust states upon its face that it "is given and received as additional and cumulative security for that certain indebtedness described in that certain deed of trust recorded in Book 27, page 71, of Trust Deeds of the records of Holmes county, Miss. (the 1914 trust deed) and in renewal of said indebtedness and of said deed of trust for all unpaid balance or balances that may be due the said D. G. Pepper or the Bank of Lexington after the crops of the year of 1914 have been finally accounted for and sold, and credited on rent and supply account, due D. G. Pepper or Bank of Lexington, for the year 1914."

The provisions of this instrument are numerous, and very binding upon the debtor. The instrument authorizes the trustee to foreclose, and even take possession of and sell, any of the property if he thinks it is endangered as security for the debt. It also authorizes the trustee to take possession of the crops in the event of foreclosure, and to gather any portion thereof in the field, gin the cotton, and sell the same either at public or private sale. This new instrument and the notes which it was designed to secure were forwarded to Mr. D. G. Pepper at Sardis, and by the latter returned to Holmes county for record. After the truse deed was filed for record, Mr. A. M. Pepper ascertained that about ten of

the mules were embraced in deeds of trust given the Bank of Belzoni. A. M. Pepper then called D. G. Pepper over the telephone and advised him of the situation. Thereupon D. G. Pepper stated, ''I cannot go any further and I want a settlement.'' A. M. Pepper at the same time notified Burton that his father had ''decided he can do nothing further'' in the direction of advancing supplies for 1915. The correspondence discloses that the tenant was at the same time saying to the landlord:

''Now, Mr. Pepper, if you will not carry out this agreement we had the other day I will have to quit business. Now, if you will not do as our agreement was we will have to get up the cotton and mules and close up our business.''

Mr. A. M. Pepper, on February 16th, is insisting that his father ''would prefer for his property to lie out than to become responsible at his age for anything further under present conditions. . . . Consequently I am very glad indeed to note from your letter that you are in position to make a full settlement as soon as you finish picking cotton now in the field, and deliver the property to a representative who my father will appoint for that purpose.''

During that time the landlord did not visit the plantations, and had no direct communication with the tenant. The landlord was in communication with his son, and told the son ''not to go any further.'' The proof then shows that the landlord declined to make the advances agreed upon for the year 1915, justifying his refusal on the ground that the other deeds of trust to the Bank of Belzoni had been discovered of record. So far as we can tell from the record, the same live stock pledged to the Bank of Belzoni are embraced in Mr. Pepper's deed of trust for 1914, and if this be true Mr. Pepper was holding a first lien on all the live stock. This lien evidenced by the deed of trust for 1914 had not been satisfied or canceled, and it is doubtful whether the existence of a second lien on a portion of the live stock would justify

the landlord in declining to make the advances agreed upon for the year 1915.

If it be conceded, however, that the landlord agreed to make advances for the crop year 1915 under a misapprehension of the tenant's financial condition or under a general mistake of fact, it necessarily follows that Mr. Pepper could not decline to advance the six thousand dollars secured by the 1915 trust deed, and at the same time hold and claim the benefit of this new lien. As suggested by counsel for appellants, the landlord is in the attitude of taking the new deed of trust, and, as soon as it is filed for record and before the ink on it is hardly dry, uses it as a basis of his suit for the appointment of a receiver. The proof, as we see it, justifies the conclusion that the landlord declined to execute the agreement evidenced by the 1915 trust deed and notes, and when he did so the tenant took the position that there was nothing for him to do but vacate the premises. In his letter of February 15th the tenant expressly says:

"If you will not carry out this agreement, . . . I will have to quit business."

And the most favorable view for the landlord is that the tenant acquiesced in the conclusion reached by the landlord in declining to make further advances. The record does not show that a representative of the landlord was sent to the plantations to demand possession. No formal demand was made upon the tenant to vacate, but if the position assumed by the tenant is to be construed as not only acquiescing in the refusal of the landlord to make advances, but also in giving possession or quitting business," then it necessarily follows that the last trust deed of 1915 should be regarded as an agreement unexecuted, canceled by agreement, and treated as if it had never been signed by the tenant. Most assuredly the landlord could not agree to supply the tenant, take a note therefor payable the latter part of the year 1915, and, as soon as the papers are executed, file suit for a foreclosure. The fact that such a lien

would not mature until the latter part of the year is a sufficient suggestion that it could not be foreclosed.

Even if this last trust deed is to be regarded as a binding contract to be performed by both parties, it could not be used as a basis for the appointment of a receiver upon the theory that the tenant was insolvent. The money agreed to be advanced was never paid the tenant, and even though the tenant should be a man of limited means and practically insolvent, this fact would not justify the landlord in having the court dispossess the tenant and substitute the judgment and business ability of a receiver for that of the tenant. If the tenant has agreed to borrow and the landlord has agreed to lend, then certainly the tenant should have a right to expend the funds and to manage his own business, in the absence of a showing that the tenant had the fraudulent intent of misappropriating the funds or was abandoning the property. The tenant had been managing his own plantations for five years, and each year had been spending moneys advanced by his landlord. The landlord had a perfect right to decline to make any advances for the year 1915, and thus to put the tenant upon his own resources. The rent note of three thousand dollars, for 1915, would be a preference claim protected by our liberal statutes, and there is no showing in this record that the tenant, if put upon his own resources and left to manage his own business, would not have raised sufficient crops in 1915 to pay the rent for that year. So much for the 1915 trust deed.

Was the appointment of a receiver justified under the deed of trust for 1914? As stated, the main portion of the cotton crops secured by the 1914 trust deed had been ginned baled, and deposited in compresses ready for the market. By agreement of the parties a sale of the crop was being delayed. The landlord held the compress receipts and was in position to sell this cotton at any time. If the cotton evidenced by these receipts was inadequate to pay the indebtedness due the complainant, he had a

right to demand a final settlement and foreclosure of the 1914 lien at any time and to that end to call upon the trustee in the deed of trust to foreclosure. At the time the bill was filed no demand had been made upon the tenant for a final settlement, the cotton had not been sold, and no demand had been made upon the trustee in the deed of trust to take possession of the live stock or other property covered by the instrument. On the contrary the landlord, in February, 1915, was in the attitude of taking additional and cumulative security, presumably for the purpose of holding the 1914 cotton for a better price. After the landlord declined to make advances for 1915 and refused to execute the agreement evidenced by the 1915 trust deed, he had a right to liquidate his demands against the tenant by selling the cotton in the compress, and either calling upon the trustee to foreclose the 1914 lien or to seek a foreclosure through the chancery court. As we interpret the pleadings and the proof this is the utmost right the complainant had, that is, to foreclose the past-due trust deed of 1914. In foreclosing, he had a right to the services of his trustee, and a foreclosure at trustee's sale or a foreclosure in equity. In either case the appointment of a receiver would have been ill-advised and unnecessary. If a foreclosure by the trustee, the latter could demand possession under the liberal terms of the instrument and the rights of the beneficiary fully protected. The trustee would have an adequate remedy at law for the possession of any of the live stock. If a foreclosure in equity, necessary writs of sequestration could be applied for and awarded, for the purpose of bringing the property into the custody of the court. Under a bill to foreclose the 1914 trust deed, there would be little that a receiver could do. In a foreclosure bill proper, the end sought would be a judicial sale of the property covered by the instrument. Such a bill would not contemplate the use of the properly pending litigation, and the relief sought by such procedure would not justify the landlord in appropriating the personal property of the tenant in

operating his own plantations for another year. If the
landlord elected to foreclose his 1914 lien, then the tenant
had a right to a speedy foreclosure and a sale of the
pledged property and the proper application of the pro-
ceeds. As it is, the following unusual decree was entered
by the court in this case:

"And it further appearing that it has become neces-
sary for the said C. H. Campbell, receiver, to deliver
said plantations known as Famosa and Winter Quarters,
in Holmes county, to D. G. Pepper, the owner thereof, in
order that the tenants and laborers thereof and thereon
might be furnished sufficient supplies for food and cloth-
ing, they being in a destitute condition when said receiv-
er took charge of said plantations, and it further appear-
ing that said receiver for the purpose of obtaining suffi-
cient feed for the thirty-six horses and mules now on
said plantations has agreed and arranged with the said
D. G. Pepper to furnish said feed until said mules and
horses are sold as prayed for in said bill of complaint,
in return for the work of said mules on said plantations,
the same to remain under the care and control of said re-
ceiver."

From this decree it is difficult to say whether the land-
lord was cultivating his own plantations in 1915 or whe-
ther the receiver was in possession and operating for the
benefit of the landlord. It is manifest that the tenant
had been ousted of possession, and the bill of complaint
in this case is made to operate as a suit for possession,
and the process of the chancery court is given the effect
of awarding immediate possession of the plantations
to the landlord. It could hardly be said that these plan-
tations are being operated by the receiver for the benifit
of the tenant. His very live stock and agricultoral im-
plements are seized without notice and given over to
the landlord to be freely used, worn, and torn, without
any compensation except the "feed" of mules. The effect
of this order is to deprive the tenant of the use of his pro-
perty without compensation, first or last. In the report

of the receiver and the petition for this order the receiver states that he—"has delivered said plantations over to said D. G. Pepper, he having agreed to supply the tenants and laborers thereon through the present year, and a-greeing to feed said mules for their work until such time as your honor may direct that they be sold and the proceeds thereof applied to the indebtedness due the said D. G. Pepper."

By this order Burton's mules, like prisoners in a foreign and hostile country, are doing service for their feed. It does appear at the time the motions came on for hearing at the May term that the cotton had been sold and the landlord was then ready to account for the proceeds, and the record does show that this cotton was then insufficient to pay what the landlord was claiming to be due. No accounting has been had, and we are not justified in drawing any conclusions as to the exact amount of this indebtedness.

It is manifest, however, that the proceedings in this cause proceed upon the idea that the lease has been terminated. The lease contract bears the stipulation that if the rental is not paid for any year the lease could be terminated at the option of the landlord, and the bill charges that the tenant had been requested to deliver over the plantations and has failed and refused to do so. The proof thus far does not prove this allegation of the bill, at least it does not show that Burton refused to deliver possession. In the prayer of the bill it is stated that "default having been made by the said R. L. Burton, lessee." If the tenant breached his lease contract the landlord had a right to demand possession and, upon failure to recover possession on demand, had an adequate remedy at law to regain the possession of the premises. The appointment of a receiver then was not necessary simply to gain possession, and even if this could be regarded as a suit for possession, summary proceedings in equity for the immediate recovery of the possession of real estate without notice would not be justified. The

use of process of the court of chancery for such purpose would be oppressive.

The situation, as we see it, justifies the conclusion that the landlord has taken possession of his own, made new contracts with the laborers and croppers, has supplied the croppers since the filing of the bill, has taken charge of the livestock and agricultural implements, and is farming his own property. He claims to be doing this under the general supervision of the receiver, but there is no order in the record authorizing the receiver to spend any money or to incur any debts. If this is the situation, then no further rent is accruing to be charged against the tenant, and the supplies being furnished by the landlord in using his own property would not be chargeable against the tenant and would not be classed as receiver's debts. The true situation seems to be that the landlord has taken full control and possession of the plantations and doing with them as he pleases, and pending a delayed foreclosure of the 1914 deed of trust is allowed to use the very property asked by him to be sold. This is unauthorized and, in fact, oppressive.

The complainant was not justified in asking for the appointment of a receiver in the first instance. The appointment was ill-advised, and the motions of the defendants to revoke the appointment should have been sustained. This is not a case where the appointment of a receiver is sought to take charge of real property to preserve rents and profits pending litigation over the rest. If it were, the appointment in such case is, as said by Mr. High "regarded as an extremely delicate branch of equity jurisdiction, and one whose exercise should be guarded with the utmost caution." High on Receivers (4th Ed.), par. 553.

To justify a receiver in a foreclosure suit, there should be a clear showing of inadequacy of the security, the insolvency of the mortgagor, and a present need for the preservation and management of the mortgaged property. There should, in this case, have been a clear show-

ing that the tenant was not only insolvent and the security insufficient, but that the tenant had either removed or abandoned the premises, or was misappropriating the property and placing it beyond the jurisdiction of the court, or doing some other act tending to destroy the value of the security. In paragraph 562, Mr. High, in discussing the rule as between lessor and lessee, says:

"The general rule already stated, denying the aid of a receiver in a contest as to title as against a defendant in possession, is applicable to the case of a lessor and lessee of real estate, and equity rarely interferes with the lessee's possession by granting a receiver. The lessee being clothed with title and possession under his lease, and being in the enjoyment of rights apparently legal, will not be deprived of his possession by a receiver, unless under very urgent and peculiar circumstances."

In the case of *Henderson* v. *Reynolds,* 168 Ind. 522, 81 N. E. 494, 11 L. R. A. (N. S.) 960, 11 Ann. Cas. 977, the supreme court of Indiana says:

"The exceptional cases are when the defendant is beyond the jurisdiction of the court, or cannot be found, or when some emergency is shown rendering interference, before there is time to give notice, necessary to prevent waste, destruction, or loss, or when notice itself will jeopardize the delivery of the property over which the receivership is extended in obedience to the order of the court. It must be a case of imperious necessity, requiring immediate action, and where protection cannot be afforded the plaintiff in any other way. *Continental Clay & Min. Co.* v. *Bryson,* 168 Ind. 485, 81 N. E. 210, and authorities cited; *Chicago & S. E. R. Co.* v. *Cason,* 133 Ind. 49, 51, 31 N. E. 827; High on Receivers (3 Ed.), pars. 113, 117; Beach, Receivers, pars. 140-143. It has been held that a receiver will not be appointed without notice when a court, as in this state, has the power to grant a temporary restraining order, without notice, and the same is ample to protect property until notice is given and the applica-

tion for a receiver heard and determined. *Grandin* v. *La Bar*, 2 N. D. 206, 213, 214, 50 N. W. 151; *McCarthy* v. *Peake* 18 How. Pr. 139, 140; *Fischer* v. *Superior Court* 110 Cal. 129, 138, 42 Pac. 561; *State* v. *Jacksonville, P. & M. R. Co.*, 15 Fla. 210, 286; *Nusbaum* v. *Locke*, 53 Ill. App. 242, 244; *Cabaniss* v. *Reco. Min. Co.*, 54 C. C. A. 190, 195, 196, 116 Fed. 318, 323, 324. It was said in *Cabaniss* v. *Reco. Min. Co.*, *supra*: 'When such notice can be given it should be given, unless there is imminent danger of loss, or great damage, or irrevocable injury, or the greatest emergency, or when, by the giving of notice, the very purpose of the appointment of a receiver would be rendered nugatory, and such instances are of rare occurrence in the federal courts, because of their power, when an injunction is asked for, to grant a temporary restraining order (Rev. St. U. S., section 718; U. S. Comp. St. 1901, p. 580 [U. S. Comp. St. 1916, section 1243a]), which may be served at the same time that the notice is served, to prevent action by the defendant or his agent, and to preserve the existing conditions, until the application for an injunction and for a receiver can be heard. *North American Land & Timber Co.* v. *Watkins*, 48 C. C. A. 254, 109 Fed. 101.' "

In the case thus freely quoted from there was an application for the appointment of a receiver for a growing crop and the appointment was asked without notice. The court reached the conclusion that a receiver should not have been appointed. This case also directs attention to the general rule that a receiver will not be appointed without notice except in cases of greatest emergency. As stated by Mr. High:

"Courts of equity are exceedingly averse to the exercise of their extraordinary jurisdiction by the appointment of receivers upon *ex parte* applications, and this practice is never tolerated except in cases of the gravest emergency, demanding the immediate interference of the court for the prevention of irreparable injury, or in cases

where defendant has absconded and willfully put himself beyond the jurisdiction of the court. And it may be stated as the settled practice, both in England and in America, to require the moving party to give due notice of the application to defendant, . . . that his property may not be summarily wrested from him upon an *ex parte* application." Paragraph 111.

Mr. High calls this "an inflexible rule which courts are not at liberty to disregard."

This is both the letter and spirit of our statute (section 625, Code of 1906). "Good cause" must be shown why the notice is not given. Mere insolvency does not justify the appointment of a receiver to take charge of the assets of an individual debtor. If this were true the woods would be full of receivers, at least in Mississippi. The appointment in the present case was attempted to be justified by showing the condition of the live stock and the improvements at the time the receiver took charge. The receiver when on the witness stand, was asked the condition of the mules. His response was, "Some good; some bad." There was also testimony that there was practically no feed on hand for the mules.

These after-litigation conditions cannot change the legal rights of the parties as they existed at the time the suit was instituted. There was indeed some testimony tending to prove that the tenant had practically no feed; that the laborers needed supplies, and that the plantations were at the time the receiver was appointed somewhat isolated or cut off by flood tides of the river. It still remains that the appointment of a receiver added practically nothing to the complainant's security.

The situation which Mr. Burton found himself in at the time should not be overlooked. He was engaged chiefly in raising cotton as a money crop. He, his croppers and his live stock had practically weathered the storms of winter; he had just made arrangements with his landlord for supplies for another year, and as soon as these arrangements were concluded the landlord took the very

trust deed which had just been executed and used it as a basis of having the receiver appointed without notice. If Mr. Burton then, as contended by counsel, not only released the croppers but suggested to some that they move, his conduct was more or less human under the circumstances, and possibly he was provoked into doing this by the hard and summary proceedings against him. The hardships with which the tenant was then contending could not be bettered or overcome by the receiver wresting from his possession every mule and every tool on the plantations, and thereby leaving the defendant stripped of everything in the way of agricultural implements or supplies. Of course, the landlord had no intention of injuring the tenant by the present proceedings. The necessary result of the receivership proceedings, however, well illustrates the hardships of having a receiver appointed without notice. The record shows that Mr. Burton was served first with an order of the court appointing a receiver without notice and a writ of assistance directed to the sheriff to oust him from possession of all of his property. Then followed a series of mandatory injunctions, *alias* writs to other counties, and a rule to show cause why he should not be fined as for a contempt of the court. Every possible process, it seems, was invoked except to call out the militia. On the hearing of the motions in May when crops should be growing, the court refused to allow the tenant to bond the personal property. The proof shows that only a small per cent of the croppers left the plantation, but most of them remained and were supplied and used by the receiver. So, in practical effect, the landlord has his plantations given over to him, and all the valuable live stock is delivered to him to be used merely for their feed and nothing more. The tenant is denied the privilege of bonding his property; court costs and interest charges are accruing; while the tenant, under threat of contempt proceedings, must quietly and mournfully look on, and that too at a distance.

The motions of the defendants should have been sustained and the appointment of a receiver revoked *in toto,* and the receiver discharged upon proper accounting. This being an appeal from an interlocutory decree, we are not called upon to determine the right of the complainant to a foreclosure of either trust deed under the pleadings as now framed, and we intimate nothing as to the duty of the chancellor on a remand of this cause other than revoke the appontment of the receiver and accept his final account.

The effort of the unsecured creditors to join in the bill after the appointment of the receiver has no direct bearing upon the rights of the parties on this appeal. It appears that they were communicated with by the complainant and his counsel, and came into this case seeking merely their *pro rata* share in any excess after the secured creditors are paid. Surely, the appointment of a receiver would diminish instead of increase their chances for a dividend.

*Reversed and remanded.*