DUNN *et al. v.* LOVE.

(In Banc.   June 5, 1934.   Suggestion of Error Overruled, October 1, 1934.)

[155 So. 331.   No. 31010.]

See, also, 295 U. S. 64.

Geo. T. and Chas. S. Mitchell, of Tupelo, and E. C. Sharp, of Jackson, for appellants.

**J. Thomas Dunn**, of Meridian, for appellant, Mrs. Birdie Lowry Dunn.

Creekmore & Creekmore, of Jackson, for appellee.

348

Flowers, Brown & Hester, of Jackson, and C. R. Bolton, of Tupelo, for appellee.

Argued orally by **E. C. Sharp,** for appellants, and by **C. R. Bolton** and **Clyde Hester,** for appellee.

**Griffith, J.,** delivered the opinion of the court.

The People's Bank & Trust Company of Tupelo, having become insolvent, closed its doors on December 24, 1930, and went into the hands of appellee as statutory liquidator. The bank remained in liquidation in the chancery court until May 15, 1933. At the time the bank closed, it owed two hundred thousand dollars of public deposits and four hundred fifty-seven thousand dollars to correspondent banks, which debts to correspondent banks were secured by approximately seven hundred thousand dollars in collateral. Thus the claims aforesaid had to be paid in full before anything was available to depositors and other common creditors; and, by collections made under the liquidation, all of said preferred claims, except a small amount in suspense, were paid and liquidated prior to May 4, 1933.

In the meantime the depositors had held meetings and had appointed a committee from among their number to represent them in considering and determining what was best to be done. The bank having been in liquidation for more than two years, and the assets which were the more readily collectible having been realized upon, and devoted to the payment of the preference and secured claims aforesaid, it was apprehended and appreciated that the time had arrived and the situation was such that thenceforth the most prudent, patient, and sympathetic attention was constantly necessary to realize upon the remaining assets of the bank, much of which was in real estate, not then, nor soon to be, salable except at a ruinous sacrifice. It was the conclusion of the committee, in collaboration with representatives of appellee who were on the ground, that the best method to pursue, and that by which most could be obtained for the depositors, was to

reorganize the bank to the end that the remaining assets could be administered by an active banking concern, thereby eliminating the continued large expense of liquidation in ordinary course, as well as the inevitable waste and loss incurred, according to common experience, in liquidation.

A plan of reorganization was finally agreed upon, and the plan was presented by petition to the chancery court in the pending liquidation proceedings on May 4, 1933, under chapter 251, Laws 1932, commonly known as the seventy-five per cent law. Upon the filing of the petition the chancellor fixed the date for the hearing thereof for May 15, 1933, and selected fifteen persons from among the five thousand depositors upon whom notice of the hearing should be served personally, and ordered that further notice be given by publication in a newspaper published in the county. The citations were served and the publication was made as ordered.

Upon the date appointed for the hearing a few objectors filed elaborate objections. The court upon the hearing found that the petition conformed to the law, was presented by more than seventy-five per cent. of the depositors in amount, was supported by the evidence, and that the proposed plan of reorganization would yield by its operation more for the depositors than could be realized by continuing the bank in the ordinary course of liquidation, and an elaborate decree was entered covering the plan and its proposals in every necessary detail.

We do not restate here the details of the plan, or the numerous objections made thereto: First, because it is not practically possible to do so in the admissible length of a written opinion. Second, because many banks have been reorganized in the state under the statute, and the differences in location, in assets and liabilities, and in the various problems to be met, make it improbable that exactly the same plan has been followed in any great number of them. And, third, because any particular plan

is to be viewed as a whole, constituent details as to which objection might seem to be well taken if standing alone, may be found to be overbalanced or offset by the advantages of other constituent details, so that at last the plan as a whole may be available and reasonably sound. We deem it sufficient to say that, except as to the stockholders' liability hereafter to be mentioned, the plan here adopted specifically preserved every item of the remaining assets of the bank for the ultimate benefit of the depositors, surrendering none of these assets. And, finally, the decree contained suitable provisions that the whole of the administration of these assets by the reorganized bank should be under the continued direction and control of the court, reports thereof to be made to the court from time to time.

At the threshold we are met with the objection that the hearing and the reorganization decree made at the hearing were without authority for want of proper legal notice to the parties in interest. It seems to be contended that a summons to all parties would have to be issued and served as if in the institution of a new suit. But the entire matter and all the parties in interest were already in court and had been for more than two years, or since the original institution of the liquidation proceedings, the notice then given as required by statute being all that was necessary to the presence of the parties and their continued presence until the liquidation proceedings were concluded. The liquidation proceeding was a quasi receivership; the petition for the reorganization was filed in and was a part of the liquidation matter, and no original process by way of summons was necessary.

In receivership and in liquidations, such as this, the court acts in all ordinary administration matters upon ex parte petition or motion and without formal notice to the parties in interest. This is a rule of necessity, because usually in these matters there are numerous parties in interest widely scattered, and to require notice of

every step to be taken would hinder and embarrass the administration and entangle it in unbearable expense. In matters of great importance, however, vitally affecting the body of the estate, notice by citation ought to be given, and in some jurisdictions the citation is regarded as essential to the validity of the decree in these more important steps in the administration. In Milner, v. Gibson, 249 Ky. 594, 61 S. W. (2d) 273, it was held, however, that notice was not essential under a reorganization petition in bank liquidation proceedings; and in Christensen v. Marine Bank (Miss.), 150 So. 375, which was in effect a reorganization proceeding, no notice was given. But whether citation under our reorganization statute is required, we are not called on here to decide, because proper citation was in fact ordered and served in the present case; it being necessary to add only that a citation is not required to be served either with the same formality or for the same length of. time as a summons. The requirement in respect to a citation is that it be served in a reasonable manner, and for a reasonable length of time, all the circumstances considered, and that requirement was well enough observed in the matter now before us.

The entire bank reorganization statute, chapter 251, Laws 1932, has been attacked by appellants as being in violation of specific sections of the state and Federal Constitutions. This statute, remedial in its nature and operation, as one among a number of legislative acts devised in the attempt to meet, so far as praticable, the unusual conditions brought about by the present economic depression, the most serious within the present generation, and in the effort to salvage something in the general wreck of things. In considering legislative and administrative efforts at salvage and rehabilitation, in the distressing situation with which the country has been and is yet confronted, we must not permit ourselves to be maneuvered into positions which would view the Federal

and state Constitutions as sculptured idols, frowning with changeless features upon a changing world; for the true view, as was said by this court in City of Jackson v. Deposit Bank, 160 Miss. 752, 768, 133 So. 195, 198, is that "the interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints," an expression taken from an opinion of the Supreme Court of the United States in Bain Co. v. Pinson, 282 U. S. 449, 51 S. Ct. 228, 75 L. Ed. 482. When examined in the light of this principle of constitutional interpretation, we can find nothing in the general purpose and scope of the statute which is prohibited either by the state or the Federal Constitution, in which connection we may observe that similar statutes have been under review in other states, and their Supreme Courts have upheld them in every case which has been brought to our attention. As typical of these cases, we may cite McConville v. Fort Pierce Bank, 101 Fla. 727, 135 So. 392, and Milner v. Gibson, 249 Ky. 594, 61 S. W. (2d) 273.

Particular complaint is made, however, of that portion of section 2 of the act which directs that proper provision must be made in the reorganization plan for the payment of correspondent banks on terms acceptable to them. It is said that this will enable these correspondent banks to enforce preferential payments to them, although unsecured, and thereby to produce an inequitable discrimination as against other unsecured creditors and depositors. There might be more than one answer to this contention, but it is sufficient to say here that, as heretofore stated, the correspondent banks in this case were all secured by ample collateral, and had been paid in full before this petition for reorganization was presented. The stated provision is, therefore, not involved in this case; and it is elemental that a constitutional complaint cannot be considered by the court when there are

no facts in the particular case which would make the complaint other than an academic discussion.

The only serious difficulty in considering the plan of reorganization adopted here is as to that portion of it dealing with the stockholders' liability. The bank had been capitalized at two hundred thousand dollars. During the more than two years that the bank had been in liquidation, appellee had been able to collect only about twenty-seven thousand five hundred dollars, and the evidence shows that it was doubtful whether more than fifty-five thousand dollars could ever be collected on this liability, and this over a period of from two to six years. It was proposed, and the plan embraced the proposal, that those of the old stockholders who could do so, would pay in fifty per cent. of their old stock, and up to the sum of fifty-five thousand dollars in new money, this to constitute the capital stock of the reorganized bank, and that those so paying should be released of the remainder of their stock liability except, of course, they would, as to that fifty per cent, be again liable for that amount on their new stock. The plan embraced the further feature that the ninety thousand dollars of old stock not participating in furnishing the required new capital would remain liable as if no reorganization had been effected.

The first and preliminary question upon this issue is one of fact, whether to accept this arrangement and the assurance which it furnished, surrendering the nominal stock liability of one hundred ten thousand dollars represented by the stockholders who raised the new capital, would be more advantageous in ultimate returns to the depositors and creditors than to refuse the plan and let the whole matter be worked out in the ordinary course of liquidation. The witnesses estimated that from ten to twenty per cent more would probably be realized from the one million five hundred thousand dollars, approximately, in remaining assets by the proposed reorganiza-

tion than by a continuance in ordinary liquidation, and this testimony was undisputed. And thus the second and final question is presented whether any plan of reorganization of an insolvent bank can be availed of which releases any class of stockholders in the original bank of any part of their stockholders' liability, whatever may be the consideration therefor. Appellants contend that this cannot be permitted, for so to do would be to impair the obligation of contracts.

That the Legislature in enacting the reorganization statute contemplated that the court should have power to allow an adjustment or readjustment of the stockholders' liability upon a fair and reasonable basis under all the circumstances of each particular case must be accepted as an inescapable conclusion. The Legislature knew in enacting the reorganization statute that it would be next to impossible to reorganize an old bank with entirely new stockholders, and with those having no connection as such with the old bank. Such new stockholders with new capital would, in all probability, organize instead an entirely new bank, disconnected from the wreckage of the old; and the Legislature knew that old stockholders, as a rule, would not be interested in putting the entire amount of their stockholders' liability in cash in new stock in the old bank, and thereby become liable again for the same amount in a new stockholders' liability, in an effort to salvage the wreckage for the principal benefit of depositors. It must have been contemplated, therefore, that reorganization in nearly all cases would have to depend on old stockholders, and that those old stockholders, many of whom would not be coercible by judgment, would, in making the new effort, do so only upon opportunity, by some reasonable arrangement, to work out their own salvation, as well as that of depositors.

It is to be admitted that a stockholder in taking stock in a bank, at the time here involved, thereby became bound in contract to the statutory stockholders' liability in favor of depositors. At the same time the depositor, when becoming such creditor, knew that this contract was one made not only as a part of the existing laws providing for the administration of that liability in favor of all depositors, and ratably among them by state agencies designated by law for that purpose, but also that the contract so made and the liability so incurred was one subject to subsequent laws reasonably enacted or to be enacted under the sovereign power of the state to legislate and to administer in the vital interest of the general welfare. Milner v. Gibson, 249 Ky. 594, 61 S. W. (2d) 273; Christensen v. Merchants' Bank (Miss.), 150 So. 375; Love v. Mangum, 160 Miss. 590, 597, 135 So. 223; Home Bldg. Assn. v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. And to say that, so long as a minority, however small, objects, no arrangement may be made by which the stockholders' statutory liability may be transmuted into another form of substantial assurance, given upon fair and reasonable consideration furnished in the arrangement by the particular stockholders immediately concerned, and producing greater benefits to the depositors, and that no law can so contemplate or authorize, although passed in the vital interest of the public welfare and for the distinct good of the greater number of those in immediate beneficial interest, would be to deny the right of the state to legislate in a reasonable and practical manner in respect to matters even of a public nature, and of a distinctly public concern, because there may be a formal intrusion thereby upon the literal terms of the constitutional provisions in reference to the impairment of contracts. That we have now passed beyond that era when such literal and rigidly technical objections may be sus-

tained, in matters of the nature here before us, and when, in ultimate results, beneficial rights have been substantially preserved, is disclosed and demonstrated by modern cases, as, for instance, the recent decision in Home Bldg. Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481, commonly referred to as the Minnesota case, and the cases cited in that opinion. In considering the constitutional guaranty against impairment of contract, courts now definitely look to substance rather than to form, realization upon the value or worth of the contract is the concern of the guaranty, not that any particular method for that realization shall be observed or preserved. As bearing directly upon the question of stockholders' liability, see In re Farmers' Exch. Bank, 55 S. D. 190, 225 N. W. 307; Nagel v. Ghingher (Md.), 171 A. 65; Milner v. Gibson, supra; and compare Andrew v. Farmers' & Merchants' Bank, 205 Iowa, 712, 218 N. W. 520; Christensen v. Merchants' & Marine Bank (Miss.), 150 So. 375.

We say finally, therefore, of the discussion upon the question of stockholders' liability, and we may have likewise so answered as to the entire of this controversy upon the merits without any elaboration of discussion, that unless the complaining depositor can show that he has been substantially injured in ultimate results, has in fact been actually hurt by the reorganization and the plan thereof, he has no right to complain whether upon constitutional or statutory or administrative grounds.

It is fundamental in all our laws of chancery procedure that before any person may complain or sue in any equity court, he must set up a cause of action of which an essential element is that he must show that he has been injured, that what has been done results in actual harm to him, Federal Land Bank v. Miss. P. & L. Co., 157 Miss. 737, 128 So. 98; and the like rule applies to all those who object to what has been done in any given situation,

whether in the chancery court or on appeal. This elemental rule fully applies also upon constitutional contentions, as was expressly recognized by this court in New Orleans, M. & C. R. Co. v. State, 110 Miss. 290, 305, 70 So. 355, 360, the court there having under consideration a constitutional question, and wherein having stated the general rule, as above mentioned, the court summarized it in the terse expression that, "one must be hurt before he complains." The petition in the case now before us showed, the evidence established, and the court adjudged, that the plan and its execution would result in a substantially greater benefit to the five thousand depositors, of whom only two are the appellants here, than had the plan not been adopted. And the case being, therefore, that the appellants are not hurt or injured in any substantial way, it follows that they are not in a position to complain.

Affirmed.

**Anderson, J.,** disqualified, takes no part.

**Ethridge, J.,** delivered a dissenting opinion.

I cannot agree to the disposition of this case made by the majority of the court. I think the proceeding here was not warranted by chapter 251, Laws 1932, and that what was done in this case was contrary to some of the provisions of the chapter. I also think that there was an insufficient and unauthorized notice to the depositors of the bank; and, as the hearing was in vacation, and not in term time, and the order setting it for hearing in vacation was not made in term time, that notice must have been given in the manner provided by some valid statute of the state. I also think that if chapter 251 is to be given a retroactive construction, and made to apply to liquidations instituted before the enactment of the

statute, the statute is unconstitutional, as impairing the obligations of contracts; and that it also violates a provision of the state and Federal Constitutions as to due process of law, and deprives the depositors of property without due process of law; and that under some of the provisions of chapter 251, and especially section 2 thereof, there is a denial of the equal protection of the law.

The majority opinion does not set forth the scheme involved in this litigation. The bank was closed for liquidation, as shown by the majority opinion, prior to the enactment of chapter 251, and the provisions of that act should not be applied to the proceedings here. In order to get a clear understanding of what is involved in this suit, it is necessary to set forth briefly the outline of the scheme proposed.

The superintendent of banks filed with the chancellor of the district in which the bank was located, and under whose jurisdiction it was being liquidated, a petition for the reorganization of the bank. It set up that the bank had been in liquidation since the 24th day of December, 1930, and that no dividends had been paid to the depositors and common creditors of the bank; but that all bills payable due by the bank to other banks had been paid; also all preferred claims which had been established. That since the closing of the said bank for liquidation some of the creditors and stockholders, acting in conjunction with petitioner, his agents, and assistants, and with some of the depositors' committee, have made efforts to rehabilitate the affairs of said bank, and put it in a solvent condition, thus enabling it to reopen for business. That the bank so closed for liquidation had total assets and liabilities of two million four hundred seventy-seven thousand one hundred fourteen dollars and seventy-eight cents. That since the closing of the bank for liquidation, the bills payable of said bank in the amount of four hundred twenty-seven thousand five hundred dollars, prin-

cipal sum, rediscounts amounting to thirty thousand dollars, making a total of four hundred fifty-seven thousand five hundred dollars, together with interest accrued thereon, and all charges for expense of collection by corresponding banks holding same, have been paid, and that the said People's Bank & Trust Company now owes no outstanding bills payable, nor is it indebted for rediscounts. That at the time of the closing of the bank for liquidation there was on deposit in said bank public moneys, which are preferred claims under the statute, approximately two hundred thousand dollars, which have also been paid. That there are no preferred claims against the bank except a named claim for two thousand six hundred thirty-one dollars and two cents, which had been adjudged to be a preference, but which at the time of the presenting of the petition was pending on appeal in the Supreme Court.

It is further alleged in the petition that the officers, directors, and stockholders of the People's Bank & Trust Company agreed with the depositors on a plan for the reopening of the bank, as outlined in the depositors' agreement, copy of which is attached, marked Exhibit 2, to the petition, which will be referred to later; that the depositors' agreement had been signed by a large number of the depositors and creditors of the People's Bank & Trust Company, in excess of seventy-five per cent of the amount of deposits and claims against that bank, there being no deposit of public moneys; the agreement being to reduce the balances due them on their deposits to the amount of twenty-five per cent thereof, this to be a charge against the reopened bank, and to be paid as follows: (a) five per cent of the original amount (or twenty per cent of the depreciated amount) as of date of opening; (b) balance to be paid in installments whenever collections have been made from the assets taken over from the closed bank shall equal five per cent of the

present outstanding deposits. All deferred payments are to be without interest. The remaining seventy-five per cent of said deposits and claims to be charged off against said bank, and set up as special accounts, which are not to be obligations of the reopened bank, but are to participate pro rata in the distribution of certain assets designated as "pool assets," as collected, as hereinafter set forth. That the margin created by the charging out of the seventy-five per cent of the balances of deposits is to permit the superintendent of banks and the directors of the People's Bank & Trust Company, with the approval of the chancery court, to charge out the assets of the bank loans and discounts and other items that are considered uncollectible and of doubtful value at this time, with the understanding that the assets so charged out will be carried in a special account by the bank under the jurisdiction of the chancery court, and collected pro rata for the benefit of the depositors and creditors whose deposits and claims have been depreciated in accordance with the terms of the freezing agreement signed by depositors and creditors.

It is further alleged that under the terms of the agreement the bank was to complete the liquidation of such assets, known as the "pool assets," under the jurisdiction of the chancery court subject to the supervision of the superintendent of banks, and to receive for such handling and collection ten per cent. of the amount collected, and attorneys' fees and costs.

It was further provided in the agreement that the stockholders' liability would be released to such of the stockholders as paid fifty per cent. thereof; but that the liability of those who did not agree to the reorganization would remain at one hundred per cent. It was further provided that approximately ten thousand dollars collected from stockholders in excess of fifty per cent. of their liability as such, would be returned to them; and,

further, that where stockholders had secured their stockholders' liability with collateral, on payment of fifty per cent. of the amount of such liability such collateral would be released to them, and they would be released from fifty per cent. of their liability on the payment of fifty per cent.

It was further provided in the agreement that the assets of the bank in liquidation, the stocks, bonds, and other obligations held as assets, would be turned over to the reorganized bank to the amount of four hundred sixty-seven thousand two hundred fourteen dollars and fifty cents, carried at a valuation of two hundred sixteen thousand eight hundred ninety-two dollars and eight cents; and that of the twenty-five per cent. assumed by the reorganized bank, four-fifths would be collected from these assets, the bank as reorganized agreeing to assure collection of as much as seven thousand five hundred dollars per year, said bank retaining the interest upon such assets during such period as it held them for collection; but if the bank realized more than two hundred sixteen thousand eight hundred ninety-two dollars and eight cents from said assets turned over to the reorganized bank, the difference would be paid into the ''pool assets.'' There was certain real estate held by the bank, on which it was also to have the rents during the period in which it held them, and was to have the privilege of buying such property with the approval of the court.

The bank was originally capitalized at two hundred thousand dollars, and the stockholders' liability at the time of closing amounted to that sum. At the time of the filing of the petition in court the bank had cash in the amount of approximately one hundred nine thousand dollars, which was in excess of the five per cent. cash which it agreed to pay depositors and creditors under the proposed agreement. The bank, as reorganized, on paying the twenty-five per cent. agreed to be paid, with-

out interest, was to be freed from further obligations to its depositors and creditors.

The petition as originally filed with the chancery court does not show the names and addresses of the depositors; and the order of publication made by the chancellor, or under his direction, does not contain the names and post office addresses of the depositors, nor does it show where such depositors live. The petition filed by the superintendent of banks does not disclose what assets were to be turned over to the bank, and what particular assets were to be placed in the pool; but on motion made by the objectors, a statement was made up and filed, giving the securities which were to be turned over to the bank, and those which were to be turned over to the pool. The decree of the chancery court on this hearing ratified and approved the scheme of reorganization as set forth, and discharged the bank and the superintendent of banks, and the agent of the banking department administering the affairs of the bank and their bondsmen, from further liability.

Chapter 251, Laws 1932, in substance, provides that the superintendent of banks may be authorized to reopen any closed bank, with the approval of the chancery court of the county in which the bank is situated, or the chancellor in vacation when at least three-fourths of the depositors and creditors therein, or any number of depositors and creditors holding three-fourths of the deposits in or claims against said bank agreed to the reopening thereof, and to accept repayment of their deposits and claims over a period of years, with or without interest, whenever the superintendent of banks is convinced that such bank is in a solvent condition, and can repay the amount in accordance with the terms of the agreement for the repayment of the same. But before any such bank shall agree to reopen, the entire plan of reorganization, and any facts connected therewith, shall

be submitted to the chancery court, or to the chancellor in vacation, by the superintendent of banks, by proper petition, such petition containing a statement of the assets and liabilities of the bank, and such other information as may be necessary to convey to the court or chancellor the true facts with reference to the condition of the bank, to obtain the approval of the chancellor.

It is provided in section 2 of this chapter that: "When any closed bank has been reopened as herein provided, the general depositors and creditors thereof who have not expressly agreed to accept the repayment of their deposits and claims in accordance with the freezing-of-deposits plan shall be bound to accept repayment of their deposits and claims on the same basis and at the same rate as those general depositors and creditors who have signed the freezing-of-deposits agreement, but this shall not apply to public depositors or to those depositors and creditors holding preferred claims, or secured claims, nor to correspondent banks holding bills payable of the closed bank. Proper provision must be made in the plan for the reopening of such bank to pay public depositors, depositors and creditors holding preferred claims and secured claims, and correspondent banks, on terms acceptable to them, but any arrangement so made shall not operate prejudicially to the rights of the general depositors and creditors of the bank."

It is provided in section 3 of the act: "That this act shall not be construed to give the superintendent of banks the right to diminish the assets of a closed bank to the prejudice of the depositors and creditors thereof, and any assets that may be charged out as doubtful or as losses shall be held by the bank and collected for the benefit of its depositors and creditors, and all amounts so collected shall be held by the bank to be paid to them in accordance with the agreement for the repayment of their deposits and claims."

It will be readily seen from this last section that the assets of the closed banks shall not be diminished "to the prejudice of the depositors and creditors." Here the scheme did diminish the assets by releasing half of the stockholders' liability, which liability is solely for the protection of depositors, and not general creditors. It also releases the reorganized bank from its previous personal liability, and releases all its future acquired property from the obligation to pay its depositors and creditors; it also gives to the bank, instead of to the creditors and depositors, the interest on the assets turned over to the bank, from which to collect the twenty-five per cent which it agreed to pay its depositors and creditors. And it gives the bank ten per cent of the amount collected from the pool assets, plus the expense of collecting same, including attorneys' fees. The act does not contemplate that any such scheme would be approved, nor that the bank would be compensated for performing its duty to its creditors; which amounts to the taking of assets belonging to the depositors and creditors. No new capital is to be paid in.

The act does not provide anywhere for the giving of notice to the depositors and creditors to appear at the hearing and contest or litigate the application for reorganization. The notice must therefore be found in some statute, and I have not been able to find a statute authorizing the giving of notice, as was here done by the chancellor. Careful examination of all statutes bearing upon the subject fails to disclose any authority in the chancellor to provide such notice as was here directed to be given. Chapter 143, Laws 1932, is entitled: "An act to authorize the chancellor and the chancery clerk, by special order in each case, to fix the return day for summons, in all matters which the chancellor or the clerk is authorized to hear and decide in vacation, and to require the defendant in each such case to answer or demur by or before the hour

of noon on the return day of such summons, duly executed.''

The statute in full reads as follows:

''Section 1. Be it enacted by the Legislature of the state of Mississippi, That in every matter or cause which the chancellor, or the chancery clerk, is authorized by law to hear and decide in vacation, the summons for the defendant or other adverse party, or party in interest not joining in the bill or petition, unless otherwise expressly provided by law in such particular form or proceeding, may be made returnable at such time as the chancellor, or the clerk, as the case may be, shall by special order direct; and in every such matter or cause the summons so directed by the chancellor to be issued, shall require the appearance of the defendant or other adverse party, or party in interest not joining in the proceeding, at such place, within his district, as may be designated in such special order. The summons, unless otherwise especially provided by law in such particular proceedings, shall be executed five days before the return day thereof, and promptly upon such execution returned by the officer executing same to the clerk who shall immediately give notice of such return, and the character of same, to the chancellor at his office by mail postage prepaid, in cases pending before the chancellor. But if such summons be not executed in the manner and for the time required by law as herein provided, another order may be made on the return day thereof by the clerk in matters pending before him, directing alias or pluries summons to issue returnable as herein designated and so continue until all defendants or other parties in interest be duly summoned; and in cases pending before the chancellor wherein original process shall not be executed in the manner and for the time required by law as herein provided, the chancellor may, after notice furnished by the clerk, as hereinabove provided, make a

special order on the return day by previous order fixed, directing the issuance of alias or pluries summons returnable as may be designated by such order, and so continue until all defendants or other parties in interest shall be duly summoned.

"Sec. 2. That in every matter or cause before the chancellor, or chancery clerk, in vacation, where the summons is made returnable as required by special order of the chancellor or the clerk, as the case may be, the defendant or other adverse party shall appear and answer or demur, after process duly executed, by or before the hour of noon on the return day of such process, unless further time be granted; and in default thereof, the chancellor, or the clerk, as the case may be, may proceed to hear and decide such matter or cause; or may, by special order, continue and reset the same for hearing and decision, either in vacation or in term time, without further or other notice than such order entered on the clerk's vacation minutes."

It will be seen from this statute that it contemplates the service of summons upon all parties resident in the state, and publication for nonresidents, and does not authorize a chancellor to formulate an independent scheme of notice.

Chapter 58, Code 1930, being the chapter on process, provides for summons and for publication in various cases. Section 2965 of the Code provides that "a summons shall not issue in any case, at law or in chancery, until the declaration, bill, petition, or other pleading beginning the cause shall be filed. The process to bring in defendants, at law and in chancery, shall be a summons, and it shall command the officer to summon the defendant to appear and answer on the return day."

Section 2969 provides for summons in cases in chancery, to be made returnable on a rule day in vacation sufficiently distant in time to admit of due service thereof, or on the first day of the next regular day, etc.

Section 2972 provides for a summons by publication, and that in a proceeding in the chancery court it shall be shown by affidavit filed, that a defendant is a non-resident of the state, or not to be found therein, and the post office of such defendant to be stated in the bill or petition; or if it be stated therein to be unknown to the complainant or petitioner after diligent inquiry, etc., the clerk shall promptly prepare and publish a summons to such party to appear and defend the suit on a rule day in vacation, or on the first day of the next regular term, if thereby the answer of the defendant would be the earlier required.

Section 2973 of the Code provides how unknown and nonresident defendants may be brought into court. And section 2977 thereof provides for a substitute publication when newspapers will not publish the notice for the compensation provided by law.

A careful reading of the whole statute will show that the publication here made was not authorized by any statute, and it is necessary for a statute to prescribe how such process shall be issued, and this must be found in the law itself. A chancellor cannot take the place of the Legislature; such authority cannot be delegated, and there has been no attempt to delegate it in the manner in which it is attempted to be exercised in this case. In J. J. Newman Lumber Co. v. Pace et al., 137 Miss. 504, 102 So. 570, it was held that the chancery court is without power to hear and determine a cause in vacation without the consent of the parties thereto. To the same effect is Yazoo & M. V. R. Co. v. Lawler, 130 Miss. 421, 94 So. 219.

See, also, upon the subject of publication and process in lieu of summons, Ponder v. Martin, 119 Miss. 156, 80 So. 388; Langstaff v. Durant, 122 Miss. 471, 84 So. 459; Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565, and notes on these cases contained in the Law Edition.

In Cooley's Principles of Constitutional Law (3 Ed.), page 243, in discussing the question of notice and hearing as a part of due process of law, it is said: "To quote the words of an eminent advocate and statesman: 'Everything which may pass under the forms of an enactment is not to be considered the law of the land. If this were so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, decrees, and forfeitures in all possible forms, would be the law of the land. Such a strange construction would render constitutional provisions of the highest importance completely inoperative and void. It would tend directly to establish the union of all the powers in the legislature. There would be no general permanent law for courts to administer or men to live under. The administration of justice would be an empty form, an idle ceremony. Judges would sit to execute legislative judgments and decrees, not to declare the law or administer the justice of the country.' And he gives us a definition of his own, in the concise and comprehensive language of which he was so eminently the master: 'By the law of the land is most clearly intended the general law,—a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society.' "

See, also, Cooley's Constitutional Limitations (8 Ed.), page 736; 6 R. C. L. 433, sec. 442 et seq.; 12 C. J., p. 1188 et seq.

It is intimated in the majority opinion, but not held, as I understand, that the liquidation of the bank was already in the chancery court, and that the parties were in court. This certainly is not the law where the hear-

ing is not to be had in term time. I do not think it competent, in a proceeding in liquidation or receivership, to make a final order in the administration of the liquidation of a bank, or in a receivership, without giving parties direct and statutory notice of the time and place of the final hearing. A hearing without notice, even in appointing a receiver, is not to be had except in the gravest emergency where delay would be disastrous. See Burton v. Pepper, 116 Miss. 139, 76 So. 762.

The case of Christensen v. Merchants' & Marine Bank (Miss.), 150 So. 375, mentioned in the majority opinion as possible authority for their opinion, has no application to a proceeding of this kind. In that case Christensen and other depositors filed an original bill in the chancery court, attacking the proceeding there. It was not a case where the court had undertaken to wind up the liquidation of a bank, reorganize a bank, and make a final adjustment between the bank and its depositors and creditors. Had the objectors in the present case filed a bill in chancery against the state superintendent of banks, and the bank in liquidation and its officers and directors, a different question would be presented, and they would be in court, and would be required to bring the necessary parties into court.

I think the act here applied to banks already in liquidation would be a violation of the obligations of a contract. The obligations of a bank to its depositors are determined by the law in force at the time the deposit was made, and at the time the bank was taken over for liquidation as an insolvent institution. It would seem that under decided authority there could be no question about the obligations of a contract being measured by the law in force at the time the contract was made. In McCracken v. Hayward, 2 How. 608, 11 L. Ed. 397, it was held that the obligation of a contract, within the meaning of a constitutional provision, depends upon the laws existing

at the time it was made. In U. S. ex rel. Hoffman v. Quincy, 4 Wall. 535, 18 L. Ed. 403, it was held that by the obligations of a contract is meant the means afforded by the law for its enforcement at the time of its creation. In Hendrickson v. Apperson, 245 U. S. 105, 38 S. Ct. 44, 62 L. Ed. 178, it was held that the obligation of a contract, in the constitutional sense, is the means provided by law to enforce its performance by the parties thereto. Whatever legislation lessens the enforcement of the contract impairs the obligations; and if it tends to postpone or retard the enforcement of the contract, the obligations of the contract are to that extent weakened.

In Murray v. Charleston, 96 U. S. 432, 24 L. Ed. 760, it was held that the obligations of contracts, within the meaning of the constitutional provision against impairment thereof, depends upon the terms and the means which the law in existence at the time affords for their enforcement.

In Selover, B. & Co. v. Walsh, 226 U. S. 112, 33 S. Ct. 69, 57 L. Ed. 146, it was held that the obligation of a contract is the law under which it was made. In Johnson v. Fletcher, 54 Miss. 628, 28 Am. Rep. 388, it was held that the Legislature cannot increase the exemptions of the existing debts, and that the act of February 12, 1875, Laws 1875, p. 122, does not protect the additional property enumerated therein from the debts existing before its passage. In Minor v. Interstate Gravel Co., 130 Miss. 553, 94 So. 3, it was held that under section 2146 of the Code of 1906 homesteads are exempt from execution by attachment, but prior covenants, or covenants running with the land defeat the homestead exemptions subsequently arising. It was held that an option to purchase lands is a covenant running with the land, and is enforceable against the grantor before or after he marries and occupies it as a homestead. It is also held that such covenant, running with the land, is superior to

the homestead right acquired after the execution of covenant. To the same effect is the decision of the United States Supreme Court in Leonidas C. Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793; Gunn v. Barry, 15 Wall. (82 U. S.) 610, 21 L. Ed. 212; Seibert v. U. S., 122 U. S. 284, 7 S. Ct. 1190, 30 L. Ed. 1161. See, also, Fisk v. Jefferson Police Jury, 116 U. S. 131, 6 S. Ct. 329, 29 L. Ed. 587; State of Mississippi, for Use of Robertson, v. Miller, 276 U. S. 174, 48 S. Ct. 266, 72 L. Ed. 517; Id., 144 Miss. 614, 109 So. 900.

It will be seen from the substance of the depositors' agreement, and the laws in force prior to the enactment of section 251, Laws 1932, that the stockholders of a banking corporation were liable to an amount equal to the shares which they own. This liability was for the benefit of the depositor's only, and each depositor has a right to have it collected and applied to the satisfaction of depositors. Also, the bank itself was liable to its depositors and creditors; and not only were its assets then owned subject to this liability, but all of its future acquired earnings were subject to be applied to it. The removal of these rights from the reach of the depositors and creditors is certainly an impairment of obligations of a contract where their rights had become vested, as they did, by the closing of the bank for liquidation. The depositors and creditors, at the time the bank was closed for liquidation, and at the time their deposits were made, had a right to demand the full amount of their deposits. It was a debt owed to the depositors and creditors by the bank at the time of its insolvency, and they had a right to stand upon their contract as it then existed. They could not be compelled to take something less than their demand in full satisfaction thereof.

By article 1 of section 10 of the Federal Constitution, the states are prohibited, among other things, from making anything but gold and silver coin a tender in pay-

ment of debts. What the chancery court has done here is not to give the depositors and creditors a money payment for their demand, as it existed when the contract of deposit was made, and at the time the bank went into liquidation, but it compelled them to accept twenty-five per cent of their demand in money, and for the rest, to accept a pool of assets of very doubtful value in satisfaction of seventy-five per cent of their demands. In the light of the authorities, this certainly would seem to be a most serious impairment of the obligations of contract.

Recurring to chapter 251, Laws 1932, I think the act is clearly, as to the depositors here involved and possibly even as to future depositors, a denial of the equal protection of the law. The common depositors and the common creditors are compelled by statute to accept whatever either three-fourths of the number of creditors agree for them to accept, or, in the alternative, whatever a lesser number having three-fourths of the credits involved, determine is best for them to take. Whereas the correspondent bank, although a simple creditor, and having a simple demand not secured by collateral or pledges, is not compelled to accept such settlement. The terms must be acceptable to such banks, and they may prevent, at their sweet will, a scheme from becoming effectual until they have been paid in full, as seems to have been done in the present case. By the very terms of the act it is not to apply to all persons in the same situation, but as to public depositors, or those depositors and creditors holding preferred claims or secured claims, or correspondent banks, although holding no preferred claims and no securities, the act shall not apply at all. It favors a bank which is a common creditor, having checks and other obligations or collections with the bank when it closed, granting to it favors at the expense of all others.

It seems to me that the violation of the Constitution, on the facts as they exist in this case, is too clear for

doubt. With due regard to the views of my brethren, and of the courts which decided Milner v. Gibson, 249 Ky. 594, 61 S. W. (2d) 273, and McConville v. Fort Pierce Bank, 101 Fla. 727, 135 So. 392, I cannot consent to let emergency, or even a desperate situation, divert the Constitution from its full and fair operation. The Constitution has been applied in many critical situations, and the principles have not proved hurtful to the general welfare. I am not willing to consign constitutional government to the scrap heap, and return to the age-old practices of autocracy and caprice. I am not willing to dance the Carmagnole in glorification of uncharted and reckless revolution. In my opinion this is a time when the courts should hold firm to constitutional principles, and afford to all litigants their full rights. I do not see how banking can be improved by ignoring the rights of depositors, and lessening the disposition of people to deposit in banks which, if any one, are responsible for the plight in which they find themselves in this unfortunate period of general depression. It seems to me that the policy of the law has wisely been to give depositors fair treatment and reasonable security; and that we are annulling in our decision some of the most important constitutional safeguards that have been set up by our forefathers for our guidance and protection. I regret the general disposition which seems to be current in public thinking, and which is affecting the judiciary of the entire country, to treat lightly constitutional principles. It seems to me that, in going as far as we have, constitutional protection has been practically disregarded.

Goodbye, dear old Constitution, I hate to see you go.

You have been a good companion; I have learned to love you so.

Give me your parting blessing before I breast the wave

Of Revolution's stormy waters, Caprice's rebellious slave;

Before I face advancing Anarchy's dark tempestuous
    tide,
With no friendly port to shield me, and no polar star to
    guide.