Dorsey v. Murphy et al.

(Division B. March 18, 1940. Suggestion of Error Overruled April 29, 1940.)

[194 So. 603. No. 33942.]

L. F. Easterling and J. E. Franklin, both of Jackson, for appellant.

294

**Butler & Snow**, of Jackson, for appellee, National Surety Corporation.

298

300

Creekmore & Creekmore, of Jackson, and **O. H. Barnett, Jr.**, of Carthage, for appellee, Leake County Bank.

Argued orally by **J. E. Franklin**, for appellant, and by **H. H. Creekmore**, for appellees.

**Ethridge, P. J.,** delivered the opinion of the court.

The appellant, complainant in the chancery court of Leake County, Mississippi, filed a bill against E. A. Murphy, guardian, the National Surety Corporation (surety on the guardian's bond) and the Leake County Bank, setting forth in substance that: Her father was a veteran of the World War, and he died in 1917 when she was an infant nineteen days old. Her father, as such veteran, was entitled to insurance under provisions of the Federal Law, and that in the year 1923, the defendant, E. A. Murphy, filed his petition in the chancery court to be appointed guardian, and to receive and handle the money paid by the United States Government upon the insurance of her said father, and that the court appointed him on the 26th day of January, 1923. The complainant was then a minor, about six years of age, and the said E. A. Murphy was required to execute bond in the sum of $2,500. Mr. Murphy qualified as guardian, giving personal bond together with J. C. Murphy and D. B. Mills, as sureties, which was duly approved.

Thereafter, the guardian collected money belonging to the said minor and filed various accounts annually. On the 17th day of March, 1927, Mr. Murphy was required to and did execute a bond with the National Surety Company of New York, as surety, in the sum of $3,500 (copy of which is filed with the bill). On or about April 1930, Mr. Murphy was required to execute an additional

bond in the sum of $1,000, and this additional bond was also furnished by the National Surety Company of New York. Thereafter, the National Surety Company of New York was placed in receivership, and the National Surety Corporation assumed the obligations of the bond and executed its agreement, in which it assumed liability for all accounts after May 1, 1933, under the two bonds executed by the National Surety Company of New York. Such bond was filed and approved.

On or about the 19th day of September 1929, Mr. Murphy, through his attorney, filed his fifth annual account of said guardianship, showing the sum of $3,508.71, which sum was being gradually increased by payments of insurance by the National Government of approximately $45 per month. On the 19th day of September 1929, the court entered an order directing and authorizing the guardian to deposit said fund in the Leake County Bank at four per cent interest, same being prayed for by the said guardian.

It was then averred in the bill that during the year 1930, the country suffered a widespread severe financial "Depression;" and the Leake County Bank, in which the said fund was deposited, was taken over for liquidation by the State Banking Department. That the guardian did not withdraw the funds from the bank, but on the contrary, willingly, wantonly, wilfully and negligently permitted and allowed the sum of money, to-wit: $3,779.-06, to remain in the bank; and, that the bank was considered to be unsafe and in an insolvent condition. On the 27th day of December, 1930, the said bank was closed by the State Superintendent of Banks.

It was further alleged that on the 18th day of March, 1931, the said guardian and his attorney, acting on their own initiative, executed an agreement with the bank, whereby the said deposit was to remain frozen, earning no interest, and subject to payment only at the rate of twenty per cent, thirty per cent and fifty per cent, in one, two and three years respectively. He accepted certif-

icates of deposit from the bank as evidence of the deposit of the said sum of money. These certificates were filed as exhibits to the bill. That this was done without the knowledge, consent or authority of the chancery court. It appears that at the September term (1931) of the chancery court, the guardian presented a report of his action in accepting the certificates of deposit, which the court approved. The first deposit of twenty per cent became due on March 18, 1932, and was paid to the guardian by the bank. Without authority of the court, the guardian agreed to deposit the money with the bank for another year at four per cent interest. That is to say, $652.90 was deposited for one year at four per cent. This act of the guardian was not authorized by and reported to the court.

It was alleged that, at the time the court approved the guardian's original action of accepting the certificate of time deposit, the ward was a minor of twelve years of age and was not capable of making a decision in the matter, and therefore the court did not have authority to approve the aforesaid action, it not having been previously authorized.

About —— day of December, 1933, the complainant married. She lived with her husband until the 10th day of September, 1935, when she was divorced. They remarried in 1937, and were living together (he acting as next friend). at the time of the filing of this suit.

On December 24, 1936, Mr. Murphy, the guardian, filed his twelfth account, which was to be final. The report showed that he had on hand, in the trust fund, the sum of $2,682, after allowing the expenditures of the administration of the estate. About three days before the filing of the twelfth and final account, the guardian, with other relatives of the ward, petitioned the chancery court to remove the disabilities of minority, of the complainant, which was done. Several days after the removal of disabilities of minority, the ward signed an affidavit and the report with the guardian, asking that the final ac-

count be approved. This report indicated that $2,671 was due her, only $90 of the amount being a liquid asset and the balance consisted of a frozen deposit and some stock in the reorganized bank.

It appears from the bill and proof that after the approval by the court of the action of the guardian in accepting certificates of deposit in March, 1931, the bank was again taken in charge by the State Banking Department and reorganized. The Banking Department had conducted an examination of the bank and found it insolvent; that is, its solvent assets were not sufficient to pay its obligations and (in 1933) the Banking Department, together with the officers of the bank, worked out a plan of reorganization under the provisions of Chapter 251 of the Laws of 1932.

Under this plan of reorganization, the officers of the bank conferred with Mr. Murphy, as guardian, and offered one-half of the deposit as a time deposit, ten per cent in cash, and the other half in a trust account which was to be paid if and when the assets of the bank, charged off and placed in a pool, were sufficient for that purpose; and, also, sold the guardian stock of the reorganized bank for a portion of the fund belonging to the ward. This transaction, according to the guardian's testimony, was not to be effective until approved by the chancery court, which approval the bank was to procure but failed to do so, but, notwithstanding such failure, issued and delivered the stock to Murphy, as guardian. It appears that it was delivered to him although he testified that he left it in the bank.

The bank charged off certain notes in their files and placed them in the pool, and selected certain other notes for use in the reorganization plan. The notes charged off were not regarded as good but were to be held in trust. From the testimony, it appeared that the bank collected some of the notes so charged off, which had been put in the pool or trust, but credited the collections to the funds of the reorganized bank and did not apply any of it to the

account to be used in paying the trust depositors. Under the reorganization plan, a Federal Agency took $60,000 in preferred stock, which money, together with twenty thousand dollars worth of the assets of the bank (notes regarded as good), and certain funds paid by the stockholders agreeing thereto into the reorganized bank to be used by the banking institution in the operation of the bank.

It was necessary for seventy-five per cent of the depositors to agree to the arrangement. Chapter 251 of the Laws of 1932, under which the bank was reorganized, provides: "That the Superintendent of Banks of the State of Mississippi be authorized to reopen any closed bank, with the approval of the Chancery Court of the county in which the bank is situated, or of the Chancellor in vacation, when at least three-fourths of the general depositors and creditors therein, or any number of the general depositors and creditors therein provided they own at least three-fourths of the deposits in or claims against such bank, agree to the reopening thereof and sign what is commonly termed a 'freezing-of-deposits agreement,' under which they agree to accept repayment of their deposits and claims over a period of years, for the full amount thereof or in reduced amounts, with or without interest, the period over which the deposits and claims are to be repaid and the rate of payment, together with the interest rate, if any, to be determined by the Superintendent of Banks, provided the Superintendent of Banks is convinced that such bank is in solvent condition and can repay the depositors the amounts of their deposits in accordance with the terms of the agreement for the repayment of same. But, before any such bank shall be reopened, the entire plan for the reopening of same, and all facts in connection therewith, shall be submitted by the Superintendent of Banks to the Chancery Court of the county in which the bank is situated, or to the Chancellor in vacation, by proper petition, duly verified, such petition to contain a statement of the assets

and liabilities of the bank and such other information as may be necessary to convey to the court or Chancellor the true facts with reference to the condition of such bank, and a decree of the court or of the Chancellor in vacation obtained approving the plan agreed upon for the reopening of such bank and authorizing the same to be reopened.''

Under Section 2 of this Act, it is provided that: when a bank has been reopened in the manner stated, the general depositors and creditors, who have not expressly agreed to accept repayment of their deposits and claims in accordance with the ''freezing-of-deposits agreement,'' shall be bound to accept repayment on the same basis and at the same rate of interest as those signing the agreement. The section further provides that this provision shall not apply to public depositors or secured claims, nor to correspondent banks holding bills payable of the closed bank; and provides for the repayment of public deposits when such bank is reopened. The Act also provides that it shall not be construed to diminish the assets of the closed bank to the prejudice of the depositors and creditors, and that any assets that may be charged off as doubtful or as losses shall be held and collected for the benefit of its depositors and creditors and paid to them in accordance with the agreement for repayment of their claims.

It does not appear from the record that the guardian looked into and considered the condition of the bank. He continued to file his annual account showing the account as though it was liquid rather than frozen, with the exception of one account which showed the money, or a portion of it, as frozen in the reorganized bank.

One of the principal questions for decision is whether a minor, whose guardian has placed funds belonging to the estate in a bank, can be bound or prejudiced by a reorganization agreement. The bank's business is affected by a public use, and rules and regulations for the control and conduct of such business is subject to the police pow-

ers of the State. Such rules and regulations may be different from a personal business or that of a corporation not so affected by a public use. See Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487; Shallenberger v. First State Bank, 219 U. S. 114, 31 S. Ct. 189, 55 L. Ed. 117; Munn et al. v. People of the State of Illinois, 94 U. S. 113, 24 L. Ed. 77. The duties and obligations of guardians in dealing with their trust are discussed in the cases of: In re: Adams' Guardianship, 169 Miss. 20, 152 So. 836; Liddell v. Strong, 183 Miss. 805, 184 So. 432; Newsom v. Federal Land Bank, 184 Miss. 318, 185 So. 595; and Lindeman's Estate v. Herbert (Miss.), 193 So. 790. Furthermore, the United States Supreme Court and this Court have upheld the constitutionality of Chapter 251 in so far as it applies to adults, nonconsenting depositors and creditors of a bank. See Dunn et al. v. Love, 172 Miss. 342, 155 So. 331, which was affirmed on appeal to the United States Supreme Court under the style of Doty v. Love, 295 U. S. 64, 55 S. Ct. 558, 79 L. Ed. 1303, 96 A. L. R. 1438.

It appears from the above statement that the chancery court had, in 1927, authorized the guardian to deposit the funds of his ward in the bank at the rate of four per cent per annum, and this was done. At that time, the bank was operating under what is known as the Guaranty Deposit Law of this State, which law was repealed by an act of the Legislature; and, it is argued that the guardian was negligent in not promptly withdrawing the funds from the bank on the repeal of this law. We think that the chancellor had the power to authorize the deposit of money in a bank in good solvent condition, at interest, whether the bank was guaranteeing its deposits or not. It is the duty of the court in such cases to ascertain the condition of the bank, and it is presumed that the deposit would not have been authorized unless this had been done and the bank found to be in good financial condition and responsible for its obligations. It is our opinion that

when money of a ward is deposited in a bank under the authorization and direction of the chancery court, the minor is bound by the provisions of Section 2 of Chapter 251 of the Laws of 1932 as to funds on deposit if authorized by the court. The ward's interest is to be as other depositors and creditors. The court has jurisdiction of the minor ward's business; and, also, has jurisdiction of the reorganization of banks when their condition becomes precarious. The minor would be subject to such losses of its funds as might be occasioned under circumstances over which there could reasonably be no control. In other words, the minor ward's funds would be subject to the business risk taken by others in the prudent handling of the bank's business. A prudent guardian, acting with average business judgment, under the sanction of the chancery court, having applied to it as directed by Section 1885 of the Code of 1930, would be acquitted of responsibility for such losses as are necessarily incurred in the reorganization of a bank in which funds of a ward have been deposited. We think it is competent for the Legislature to provide reasonable rules and regulations governing affairs of minors as well as adults. However, we do not think that it is permissible for a bank to sell a guardian the stock of the bank, even with the consent of the chancery court, because of the liability of stockholders which has been imposed by law, and it is not contemplated that a minor assume an obligation in such cases which could not be repudiated by the minor. Mellott v. Love, 152 Miss. 860, 119 So. 913, 64 A. L. R. 968. In the case before us, there was no petition to the chancery court, as required under Section 1885, to buy the stock for the minor; and, consequently, the sale was void, and the guardian and the bank are liable under the provisions of law as contained in said section, with interest at the rate of eight per cent per annum from the date of the sale of the stock to the present time.

Likewise, the guardian was not authorized by the chancery court to deposit, on time certificate, the first install-

ment payment of twenty per cent under the freezing agreement plan, and the guardian and the bank are liable for that sum of money so redeposited. The law bearing on this subject may be found in the cases of: In re Adams' Guardianship, 169 Miss. 20, 152 So. 836; Liddell v. Strong, 183 Miss. 805, 184 So. 432; Newsom v. Fed. Land Bank, 184 Miss. 318, 185 So. 595; and Lindeman v. Herbert (Miss.), 193 So. 790. It is clear that the failure to comply with Section 1885 renders the guardian liable for this amount, with eight per cent interest.

It seems to have been the theory of the court below that the removal of disability of the minor ward by the chancery court, together with the fact that she signed and approved the final account, bound her regardless of the liability imposed upon the guardian under Section 1885; and, on that ground the guardian had not properly managed the guardianship. It appears from the record that the guardian did not make a full disclosure to the ward of the exact status of his account so approved, and she was not advised of the value of the securities. Although the disabilities of minority had been removed, the ward was induced to sign the final report, agreeing to its correctness, within three days thereafter. There was no disclosure, so far as the record discloses, that would enable her to accurately judge the condition of the stock and of the frozen deposit. A guardian being under a high duty as trustee to make a full and complete disclosure to the ward of the true condition and of the true value of the assets before having a settlement, and having failed to do so, the ward is not estopped by such acts. Upon the ward's arriving at the age of eighteen, and being married, it was the duty of the guardian to file a final account.

While the disabilities of minority were removed for the purpose of enabling the ward to go into a business which she contemplated entering, and it was known to the bank and the guardian that the securities held by the guardian were worthless, it nowhere appears that this

was specifically disclosed to her prior to the final account being approved. It is true that there was testimony in the nature of a general conclusion that the account and the value of the securities were discussed and that she understood the matter, but it does not appear, as it must appear, that the true nature of the business had been disclosed—that the value had greatly depreciated, to the extent of being practically worthless. It affirmatively appears that she did not realize it, as she went to the bank to get her money, believing that the bank would pay it upon the surrender of the stock and the certificates of deposit; and, when she was told that she would not be paid, she left the stock and certificates at the bank and refused to receive them in satisfaction of her claim.

Furthermore, the decree of the court approving the final account provided that the guardian turn over the the same to the ward and take her receipt and file it in the files of the cause, and thereupon the liability of the guardian and the surety should cease. This was not done. No receipt was taken. The guardian took the certificates of deposit and the stock to the home of the ward's mother (where she lived), but she was absent, and they were left with the mother without any explanation of the condition affecting their value.

It further appears from the evidence that the bank collected on notes placed in the pool, and applied the receipts from such collections to its own purposes and paid nothing to the account of either the frozen deposits or the funds placed in the pool for the depositors whose claims were pooled. Of course, the bank could not so deal with them. It had accepted the arrangement by which it became the trustee for the purpose of collecting the notes charged off for the benefit of the depositors whose accounts had been charged off the books and placed in the pool. The bank should have been required to credit the proper account, and show with what diligence it had tried to collect such pooled assets for the benefit of the depositors accounts which had been placed in the pool. The

chancellor's theory seemed to have been that the pleadings were not sufficient to justify inquiring into the method by which the bank had handled the business entrusted to it, both as trustee for the pool creditors and for the depositors whose accounts were frozen but subject to ultimate payment.

In inquiring into the accounts of guardians, the court is not controlled by strict technical rules. It should inquire into the matter and look after the interest of the minor even though that interest is not set forth with technical precision in the pleadings. This seems to be clearly the purpose of the law as contained in Section 370 of the Code of 1930, providing that: "In proceedings in matters testamentary and of administration, in minors' business, and in cases of idiocy, lunacy, and persons of unsound mind, as provided for by law, no answer shall be required to any petition or *application of any sort*, and such a petition or application shall not be taken as confessed because of the want of an answer; but every petition, application, or account shall be supported by the proper evidence, and may be contested without an answer. And all such proceedings shall be as summary as the statutes authorizing and regulating them contemplate; but when either of the parties having a controversy in court as to any of said several matters shall require, and the court shall see proper, it may direct plenary proceedings by bill or petition, to which there shall be an answer, on oath or affirmation; and if an adult or sane party refuse to answer as to any matter alleged in the bill or petition, and proper for the court to decide upon, the said party refusing may be attached, fined, and imprisoned at the discretion of the court, and the matter set forth in the bill or petition shall be taken as confessed, and a decree be made accordingly." (Italics ours.) See also Newsom v. Federal Land Bank, 184 Miss. 318, 185 So. 595; Lindeman v. Herbert (Miss.), 193 So. 790.

The court is under the duty to see that the interest of the minor is properly presented, and has power to re-

quire any amendment or specific proceeding to be filed as it may deem necessary for the ascertainment of the truth. It was certainly the duty of the guardian to give more attention to the minor's affairs embraced in the pool and in the frozen deposits even if it had been authorized by the chancery court. It further appears from the record that the Federal authorities charged with the duty of looking after the business of minors, under Federal regulations, in cases similar to the one here, where funds are granted by the Federal Government to children of deceased soldiers, filed an exception to the final account but withdrew it when furnished with copies of the petition and decree approving the final account (which had been approved by the minor ward), on the belief that the full matter had been investigated by the court and the ward.

The record is quite voluminous, and we deem it unnecessary to set forth other facts embraced in the suit, leaving the matter open to the chancery court, on the remand of the case, to deal with such matters as are not mentioned here, in accordance with the views herein expressed.

The judgment of the court is reversed and the cause remanded for further proceedings.